## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF VIRGINIA

### Alexandria Division

| | | |
|---|---|---|
| Leroy Lovelace,<br>    Plaintiff, | )<br>)<br>) | |
| v. | )<br>) | 1:18cv684 (TSE/TCB) |
| Armor Correctional Health<br>    Services, Inc., et al.,<br>    Defendants. | )<br>)<br>)<br>) | |

### MEMORANDUM OPINION

Leroy Lovelace ("Plaintiff" or "Lovelace"), a Virginia inmate proceeding pro se, filed a civil-rights suit under 42 U.S.C. § 1983, alleging his constitutional rights were violated while detained at the Virginia Department of Corrections' ("VDOC") Greensville Correctional Center ("GRCC"). After being allowed leave to file an amended complaint, Plaintiff filed an amended complaint against seven VDOC employees and four medical personnel that provided care at the GRCC [Dkt. No. 7], and he seeks declaratory and injunctive relief, compensatory and punitive damages, and costs. [Id. at 1, 37, 38]. The amended complaint was screened, and Defendants Harold W. Clarke, M.D. Jose Armas, Carolyn Parker, S. Taylor, and A. Smith were dismissed without prejudice. [Dkt. No. 12]. VDOC Defendants Pearson and Shilling filed a motion for summary judgment on October 15, 2019 [Dkt. No. 22], Plaintiff responded [Dkt. No. 33], and on May 19, 2020 the Court granted the motion for summary. [Dkt. Nos. 42, 43].

Medical provider defendants Vincent Gore, M.D., L. Ellis,[1] RN, and E. Shaw, RN filed a motion for summary judgment on August 25, 2021, with a supporting brief, exhibits, and

---

[1] Although the Court and Defendant Ellis share the same surname, there is no relationship, familial or otherwise, between the Court and defendant Ellis.

affidavits. The defendants advised Plaintiff of his opportunity to file responsive materials

pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975), but the Court entered a stay on

September 2, 2021 in an attempt to obtain service on defendant J. Cutchin, M.D. [Dkt. No. 67].

The summons for Cutchin was returned unexecuted on November 4, 2021. [Dkt. No. 70].[2] On

December 9, 2021 the Court lifted the stay and afforded Plaintiff twenty-one days to file a

response to the pending motion for summary judgment filed by defendants Gore, Ellis, and

Shaw. [Dkt. No. 71]. The Court granted him an additional extension of time and on February 11,

2022, he filed a brief in opposition, and affidavit, and a declaration with numerous exhibits. [Dkt.

Nos. 75-77]. This matter is now ripe for disposition. For the reasons that follow, the medical

defendants' motion for summary judgment must be granted, and the claims against the served

medical defendants must be dismissed.

## I. Amended Complaint

On April 26, 2009, Plaintiff had a heart attack and on April 30, 2009, he underwent

surgery at the Medical College of Virginia[3] ("MCV") and received an implantable cardiac

defibrillator ("ICD"), which monitors and adjusts his heart rhythms. When discharged from the

hospital, Plaintiff's medication regimen included "Metoprolol, Simvastatin, Lisinopril, and

Aspirin to be taken daily to help prevent future arrhythmias or sudden cardiac arrest" and Sotalol

and Magnesium Oxide were added to his medication regimen in 2014. [Dkt. Nos. 7 at ¶¶ 8-10;

---

[2] Defendant Cutchin has not been served. A Notice of Lawsuit and Request for Waiver of Service of Summons was issued on July 23, 2019 for Cutchin along with the other defendants [Dkt. No. 12] and sent to GRCC, but there was no response. A summons issued on September 21, 2020, for Cutchin was returned unexecuted on October 21, 2020, and indicated that Cutchin was no longer employed at GRCC. [Dkt. Nos. 47, 49]. A Notice of Lawsuit and Request for Waiver of Service of Summons was issued on June 1, 2021 and sent to an address provided by Cutchin's former employer. [Dkt. No. 57]. There was no response and the Clerk issued a summons, which the United States Marshall Service returned unexecuted on November 4, 2021. [Dkt. No. 70].

[3] Plaintiff's medical records use the acronyms VCU/MCV, MCV, and VCU when referring to offsite medical appointments. To simplify, the Court will simply use MCV.

65-1 at 161]. Plaintiff continued to see outside medical personnel at MCV approximately every six months. The MCV doctor discontinued the Metoprolol and started Plaintiff on Carvedilol. [Id. at ¶ 8]. On September 23, 2014, Plaintiff saw outside medical personnel at the Southside Regional Hospital and Sotalol was added to his medication regiment. [Id. at ¶ 12].

Plaintiff alleges that Defendants Gore, Cutchin, Shaw and Ellis were deliberately indifferent to his serious medical needs based upon alleged intermittent problems with the renewal of medications he took for his cardiac condition, a change in one of his medications, and a failure to schedule Plaintiff for his defibrillator to be checked.[4] Plaintiff alleges ten incidents that occurred from June 2016 through June 2018 in support of his allegation the defendants were deliberately indifferent.

- In June 2016, Defendant Cutchin changed his prescription from Sotalol to Metoprolol and Plaintiff went without Sotalol for fifteen days. [Dkt. No. 7 at 15-16].
- On August 14, 2016, Plaintiff's Sotalol prescription was not available for pickup and he was without Sotalol tablets for five days. [Id. at 16-17].
- On August 31, 2016, Plaintiff's Magnesium Oxide pills were not available for pickup and he received the Magnesium Oxide pills on September 3, 2016. [Id. at 20; Dkt. No. 8 at 27].
- On December 31, 2016, Plaintiff's Magnesium Oxide pills were not available for pick up and he received the Magnesium Oxide pills on January 8, 2017. [Dkt. No. 7 at 20].
- On July 2, 2017, Defendant Cutchin changed Plaintiff's Carvedilol dosage from two pills per day to one pill per day.
- On March 22, 2017, Plaintiff's Sotalol prescription was not available for pickup and he received the Sotalol pills on March 26, 2016. [Id. at 21].
- On April 2, 2017, Plaintiff's Lisinopril, Simvastatin, Carvedilol, and Aspirin prescription were not available for pickup and he received the medications on April 5, 2017. [Id. at 22-23; Dkt. No. 8 at 49].

---

[4] The December 9, 2021 Order also directed Plaintiff to provide an address for service on defendant Cutchin within twenty-one days or explain why defendant Cutchin should not be dismissed without prejudice pursuant to Fed. R. Civ. P. 4(m). Plaintiff has failed to provide an address at which to serve defendant Cutchin and has not explained why Cutchin should not be dismissed without prejudice pursuant to Fed. R. Civ. P. 4(m). [Dkt. No. 71]. Accordingly, Defendant Cutchin will be dismissed without prejudice.

- On October 27, 2017, Plaintiff's Carvedilol prescription was not available, and he received the medication on November 2, 2017. [Id. at 23-24].
- On June 28, 2018, Plaintiff did not receive his Simvastatin and he received the medication on July 5, 2017. [Id. at 23-24; Dkt. No. 9-6 at 3].
- On August 31, 2017, Plaintiff complained that he had not been scheduled for his defibrillator checkup review at MCV. [Dkt. No. 7 at 23].

Plaintiff alleges that Defendants Gore, Cutchin, Shaw, and Ellis had actual and constructive knowledge of Plaintiff's serious medical needs. [Id. at 25, 29, 36].[5]

The served Defendants assert that their evidence establishes that there is no genuine issue of material fact concerning this matter and Lovelace's claims fail to evince deliberate indifference; therefore, Defendants' Motion for Summary Judgment must be granted, and the amended complaint dismissed with prejudice. Plaintiff argues that he has established a pattern of conduct that is sufficient to establish deliberate indifference.

---

[5] In his brief in opposition, Plaintiff tries to enlarge the time frame he set out in his amended complaint to incidents before June 2016. [Dkt. No. 75 at 6]. The earliest specific complaint contained in the amended complaint references "on or about June 1, 2016," as the first specific instance his medication refill was not available when he alleges it should have been. [Dkt. No. 7 at ¶ 30]. Plaintiff swore to the original complaint on May 29, 2018. [Dkt. No. 1 at 26], and the first alleged incident was the same June 1, 2016 Pill Call where the medication was not available. [Id. at 15-16]. The complaint encompassed matters that occurred within the two years prior to the filing of the complaint, which coincides with the statute of limitations. In the portion of the amended complaint in which Plaintiff sets forth the specifics with regard to each defendant [Dkt. No.7 at 26], the following are the earliest dates alleged with regard to the conduct of the current three served defendants: Plaintiff alleges he submitted an offender request to Dr. Gore dated January 13, 2017 [Id. at 29, ¶ 71]; Plaintiff references the June 1, 2016 Pill Call incident with respect to Nurse Shaw [Id. at 31-32, ¶¶73-76]; and Plaintiff references the same June 1, 2016 incident with respect to Nurse Ellis. [Id. at 34, ¶¶ 83-84]. Accordingly, matters that Plaintiff has included in his several responses to the motion for summary judgment that pre-date June 1, 2016 are not relevant with regard to the nine specific matters he has alleged against the three remaining defendants. See Bridgeport Music, Inc. v. WM Music Corp., 508 F.3d 394, 400 (6th Cir. 2007) ("To the extent [a party] seeks to expand its claims to assert new theories, it may not do so in response to summary judgment or on appeal."); Barclay White Skanska, Inc. v. Battle Mem'l Inst., 262 F. App'x 556, 563 (4th Cir. 2008) (stating that a plaintiff may not amend a complaint through briefs filed in opposition to a motion for summary judgment); White v. Roche Biomedical Labs, Inc., 807 F. Supp. 1212, 1216 (D.S.C. 1992) ("[A] party is generally not permitted to raise a new claim in response to a motion for summary judgment ...."). To the extent Plaintiff seeks to amend his complaint by raising new matters in a response to a motion, he may not do so via a brief. See Hurst v. District of Columbia, 681 F. App'x 186, 194 (4th Cir. 2017) ("a plaintiff may not amend her complaint via briefing") (citing Pennsylvania ex rel. Zimmerman v. PepsiCo, Inc., 836 F.2d 173, 181 (3d Cir. 1988)); Zachair, Ltd. v. Driggs, 965 F. Supp. 741, 748 n.4 (D. Md. 1997) (a plaintiff is "bound by the allegations contained in [his] complaint and cannot, through the use of motion briefs, amend the complaint."), aff'd, 141 F.3d 1162 (4th Cir. 1998).

## II. Statement of Undisputed Facts

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Defendants, pursuant to Federal Rule of Civil Procedure 56 and Local Rule 56, set forth a statement of material facts that defendants contend are undisputed. In response, Plaintiff substantially complied with his obligations under those Rules by submitting statements of undisputed and disputed facts and included citations to the record.[6] Several of Plaintiff's points were well taken and have been incorporated into the following statement of uncontested facts, which is derived from a review of defendants' statement of undisputed facts, the nonmovant's response, and the record.[7]

### Parties

1. Plaintiff is an inmate in the VDOC and was housed at GRCC at all relevant times. He

---

[6] Plaintiff states in his Brief in Opposition that he has been denied discovery of "relevant records from MCV hospital." [Dkt. No. 75 at 6]. Although Plaintiff did file a motion on January 15, 2020 stating that he would be filing a "future discovery" request for his cardiac reports from VCU hospital (which the Court equates with MCV) [Dkt. No. 36 at 3], he made no such motion thereafter. On May 18, 2020, the Court denied the motion for discovery noting that it was untimely because the motion came after Plaintiff had already filed his brief in opposition to the then pending motion for summary judgment filed by defendants Shilling and Pearson; the motion did not establish how it was relevant to Shilling and Pearson; and the motion sought discovery of matters unrelated to the claims against Shilling and Pearson. [Dkt. No. 41]. Plaintiff filed a motion for discovery on September 28, 2020 [Dkt. No. 48], and a request for production of documents (including medical records) directed to the defendants [Dkt. No. 50]. The Court denied the motion for discovery because Plaintiff had not demonstrated that informal methods of obtaining his medical records had failed. [Dkt. No. 56 at 2]. Plaintiff has also used the medical records filed by the defendants and incorporated them into his responses, but Plaintiff did not file a declaration along with his response to the pending dispositive motions. To the contrary, Plaintiff argues that "Ellis and Shaw's culpability is explicit" and Gore's action, based upon the record, establish deliberate indifference. [Dkt. No. 75 at 7, 8]. Further, although he filed an affidavit and a declaration, neither avers that additional discovery was necessary to respond to the motion for summary judgment Pa. Dep't of Public Welfare v. Sebelius, 674 F.3d 139, 157 (3d Cir. 2012) (failure of a party seeking discovery in response to a summary judgment motion must include an affidavit specifying "what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained" and if such an affidavit is not filed, the motion for discovery is properly denied); see also Hodgin v. UTC Fire & Sec. Ams. Corp., 885 F.3d 243, 250 (4th Cir. 2018) (noting Rule 56(d) requires a party opposing summary judgment to "shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition").

[7] The record in this case includes the defendants exhibits and affidavits [Dkt. Nos. 65-1 through 65-4], and Plaintiff's verified amended complaint and attachments, affidavit, and declaration. [Dkt. Nos. 7, 8, 9, 75-77].

enrolled in the Self-Med Program at GRCC on October 13, 2013 [Dkt. No. 7 at ¶ 29], which is also referred to as KOP ("keep on person"). Prisoners on KOP medications are responsible for requesting their own prescription refills 7 to 10 days prior to their last dose of medicine. [Dkt. No. 65-3 at ¶ 8].[8] Once the request is received from the offender it is processed and submitted to the offsite pharmacy. [Id.]. Once the off-site pharmacy supplier has filled the medication it is returned to GRCC by common carrier. [Id. at ¶ 6]. Once a KOP medication is received by GRCC from the off-site pharmacy supplier it is verified by the GRCC Pharmacy nurse and then delivered to the housing unit where the offender can collect the medicine on Wednesdays, Saturdays, or Sundays. [Id.]. For a KOP prescription to be processed and available for pick-up at the housing unit Pill Call Window takes 7 days, but non-formulary medications may take longer. [Id. at ¶ 8].

2. Defendant Gore is a physician licensed to practice in Virginia, and is the Medical Director at GRCC where he practices medicine and at times provides utilization review and he has the authority to authorize referral requests for diagnostic studies and specialty care for inmates housed at GRCC. [Dkt. No. 65-2 at ¶¶ 1, 5]. Gore does not generally have any role in providing medical care to inmates outside the GRCC infirmary and did not provide clinical care to Plaintiff in the timeframe referenced in the amended complaint. [Id. at ¶¶ 5, 6]. Gore is not involved in obtaining the medications from the GRCC off-site pharmacy supplier. [Id. at ¶ 8].

3. Defendant Shaw is a registered nurse licensed to practice in Virginia, and currently works as the Clinical Health Services Administrator at GRCC, but was employed as a Nurse Manager at GRCC during the relevant time period. [Dkt. No. 65-4 at ¶¶ 1, 3]. A Nurse Manager

---

[8] Requiring the inmate to request refills is not a specific term of the KOP contract. [Dkt. No. 9-1]. Plaintiff, however, routinely made such requests and this course of conduct is not disputed.

at GRCC is an administrative position that does not involve the provision of clinical care to offenders, administration of offender medications, the scheduling of appointments for offenders to be evaluated by healthcare providers, or interactions with the off-site pharmacy supplier for GRCC. [Id. at ¶ 6]. Her duties[9] included investigating informal complaints, resolving the issues raised by the complaints if possible, and otherwise responding to these complaints, but she did not work directly with the nurse assigned to do sick call evaluations on any given day, provide clinical care to offenders during nurse sick call encounters, and did not determine whether an offender would be seen by a healthcare provider on any given day. [Id. at ¶ 11].

4. Defendant Ellis is a licensed practical nurse licensed to practice in Virginia, and practices as a staff nurse at GRCC and at the time of the amended complaint was assigned, along with other staff nurses, to Pill Call and Pharmacy, in addition to other nursing areas at GRCC. [Dkt. 65-3 at ¶¶ 1, 5]. Nurses assigned to Pharmacy and Pill Call are responsible for submitting order requests for prescription medication refills to the off-site pharmacy supplier for GRCC. [Id. at ¶ 6]. Ellis and other staff nurses at GRCC assigned to the pharmacy are not involved with operations at the off-site pharmacy supplier, nor do they have any influence or control over the length of time it takes the off-site pharmacy supplier to provide a medication once the refill request has been made. [Id.].[10]

---

[9] Plaintiff objects to Nurse Shaw's listed duties and avers in his sworn brief in opposition that Nurse Shaw's duties included supervising, monitoring, overseeing, and directing the daily activities of the nursing staff. [Dkt. No. 75 at 3]. Plaintiff does not, however, aver from personal knowledge or first-hand experience, and his objection is not well taken. Although credibility determinations are not made at the summary judgment stage, parties' differing beliefs about a fact when the plaintiff solely relies on his own self-serving testimony cannot create a genuine dispute of material fact. See Harris v. Home Sales Co., 499 F. App'x 285, 294 (4th Cir. 2012); see also DiQuollo v. Prosperity Mortg. Corp., 984 F. Supp. 2d 563, 570 (E.D. Va. 2013) ("The law is well established that uncorroborated, self-serving testimony of a plaintiff is not sufficient to create a material dispute of fact sufficient to defeat summary judgment."). Importantly, although Plaintiff avers that his statement is true to the best of his knowledge and belief, he does not swear to it based upon personal knowledge or first-hand experience and did not include his assertions about Shaw's duties in his separate affidavit, which was based upon "personal knowledge." [Dkt. No. 76 at 1].

[10] Plaintiff disputes the general statement that nurses other than Nurse Ellis were involved in the submitting requests for inmate medication refills. [Dkt. No. 75 at 5]. His "objection" is irrelevant. Plaintiff has alleged specific instances

Plaintiff's Informal Complaints and Grievances

5. On June 1, 2016, Plaintiff went to pick up his Self-Meds (Sotalol, Lisinopril,

Simvastatin, Carvedilol, Aspirin, and Magnesium Oxide) at the Pill Call Window.[11] His Sotalol

prescription had been cancelled and he had been prescribed Metoprolol. Plaintiff filed an

Emergency Grievance (No. 85127) regarding the change in his medication, which was deemed

not to be an emergency, and he filed a second Emergency Grievance (No. 85130), but received

no response. [Id. at ¶ 31].

6. On June 9, 2016, Plaintiff saw Dr. Cutchin and Cutchin explained that he had

cancelled the Sotalol because it was not on the formulary list. [Id. at ¶ 33]. Plaintiff protested,

and Cutchin renewed the Sotalol prescription on June 15, 2016. Plaintiff did not have his Sotalol

prescription for fifteen days. [Id. at ¶ 37]. Plaintiff did not have any "physical complaints" at that

time. [Dkt. No. 8 at 2].

7. On June 9, 2016, Plaintiff filed an informal complaint and later a formal grievance, No.

GCC-16-REG-00474, complaining that his medication had been changed arbitrarily. Defendant

Shaw received the informal complaint on June 13, 2016 and responded on June 15, 2016 that the

medical provider discontinued Sotalol, ordered Lopressor (Metoprolol[12] is the generic name),

---

involving Nurse Ellis in the Amended Complaint. [Dkt. No. 8], and those are addressed herein. In a facility as large
as GRCC, over 2900 inmates each year from 2015 through 2018, see https://vadoc.virginia.gov/general-
public/population-reports/ (last viewed Mar. 3, 2022), however, it is not a fact beyond Nurse Ellis's experience to
know that other members of the medical unit are also involved in ordering refills for inmates. Plaintiff himself
alleged in the amended complaint that at any given time there are thousands of prescriptions that need to be handled
by the medical staff, and that there were nearly 3000 inmates at GRCC. [Dkt. No. 7 at ¶¶ 26, 73]. Plaintiff certainly
has no direct knowledge of who ordered each of his refills, has not so averred, and his objection is not well taken.
Plaintiff also disputes whether Nurse Ellis has any authority or influence over the off-site pharmacy. [Dkt No. 9 at
5]. Again, Plaintiff has no personal knowledge of such matters and his objection is premised upon speculation at
best. Further, the fact that GRCC medical unit has changed the manner in which it orders refills is irrelevant to what
authority Nurse Ellis had over off-site the pharmacy in the June 2016 through June 2018 timeframe.

[11] Carvedilol is also known as Coreg.

[12] See https://www.mayoclinic.org/ (click on Health Information and then Drug & Supplements, search Metoprolol)
(last viewed Mar. 3, 2022).

8

that both medications were beta blockers used in treating similar conditions, and that after a sick call visit on June 9, 2016, the Sotalol had been reordered by the provider. [Dkt. Nos. 65-4 at 8; 65-1 at 201-05]. Plaintiff did not make any "physical complaints" during the June 9, 2016 sick call. [Dkt. No. 8 at 2, 5]. The Warden determined the grievance was unfounded and the Health Service Director upheld that determination on appeal. [Dkt. No. 7 at ¶ 32].

8. On July 24, 2016, Plaintiff submitted an offender request to Defendant Ellis informing her that his supply of Sotalol tablets would run out on August 13, 2016. The offender request was forwarded to the "sick call nurse."[Dkt. No. 8 at 25]. Plaintiff went to the Pill Call Window on August 15, 2016, but did not receive any Sotalol tablets. On August 15, 2016, Plaintiff filed an Emergency Grievance (No. 85157). Defendant Ellis responded to the grievance within one hour and twelve minutes. The response informed Plaintiff that his Sotalol prescription would be available on August 16, 2016, and that he would be called to the Pill Call Window when the medication was available to be dispensed. [Dkt. No. 8 at 24]. Ellis determined that the grievance did not meet the definition of an emergency because it was a request for information on the status of a medication refill and the grievance did not set forth that Plaintiff had any symptoms that would have qualified as an emergency based on her training as a nurse. [Dkt. Nos. 65-3 at ¶ 11; 8 at 24]. Plaintiff alleges he went without Sotalol for two days and received his Sotalol prescription on August 17, 2016. [Dkt. No. 75 at 3].[13]

9. On August 14, 2016, Plaintiff submitted an informal complaint stating that medical had failed to timely provide his Sotalol prescription. The informal complaint was received on August

---

[13] Plaintiff "disputes" this statement of fact stating that Nurse Ellis knew his Solatol was for a heart condition and that it was "to be taken uninterrupted." [Dkt. No. 75 at 5]. The content of the Emergency Grievance at issue was limited to a complaint that Plaintiff's Sotalol had not been available on August 14, 2016, and did not list any specific medical complaint, need, or concern. [Dkt. No. 8 at 24]. Because the Emergency Grievance did not set out any complaint other than the need for the refill, Nurse Ellis informed Plaintiff the Solatol would be available the following day and found the complaint did not rise to the level of an emergency.

15, 2016 and responded to by Defendant Shaw on August 18, 2016. Shaw noted that the medical

record indicated that Sotalol tablets were dispensed to Plaintiff on July 16, 2016 and 60 more

were dispensed on August 17, 2016 during self-medication Pill Call. Shaw further noted in the

response that every effort was being made to have Plaintiff's medications available for pickup

when due. [Dkt. Nos. 65-4 at ¶ 16; 8 at 23-24; 65-1 at 206].[14] Plaintiff then filed a regular

grievance, No. GCC-16-REG-00597, which the Warden's designee determined was unfounded,

and the Health Service Director upheld that determination on appeal. [Id. at ¶¶ 43-44].

   10. On August 31, 2016, Plaintiff went to the Pill Call Window to pick up his Magnesium

Oxide pills, but they were not available. Plaintiff filed an Emergency Grievance (No. 097412),

and a non-defendant nurse responded and determined that it was not an emergency. [Id. at 47].

Plaintiff received his Magnesium Oxide three days later, but filed a regular grievance, No. GCC-

16-REG-00688. The grievance was deemed unfounded, and the Health Service Director upheld

that determination on appeal. Plaintiff was directed to submit refill requests "seven days prior to

running out" of his medication and the matter was deemed unfounded because it had been

resolved at the informal level. [Id. at ¶¶ 47-48; Dkt. No. 8 at 27].

   11. On December 24, 2016, Plaintiff requested 30-day refills, but the Magnesium Oxide

was not available on December 31, 2016 at the Pill Call Window, and Plaintiff submitted

Emergency Grievance No. 102887. [Dkt. No. 8 at 34]. A non-defendant determined the

grievance was not an emergency. [Dkt. No. 7 at ¶ 49]. On January 1, 2017, Plaintiff submitted an

informal complaint stating that his Magnesium Oxide refill had not been ordered. The informal

complaint was received on January 3, 2017 and Shaw responded on January 10, 2017 that

---

[14] In his amended complaint, Plaintiff alleged that he went without his Sotalol for five days. [Dkt. No. 7 at ¶¶ 38-39]. In his sworn brief in opposition, however, Plaintiff states that his refill was due on Sunday, August 14, 2016 and that he did not receive his refill until August 17, 2016. [Dkt. No. 75 at 3]. It appears, therefore, that the Plaintiff was without Sotalol medication for 2-3 days — August 14 and 15, 2016.

Plaintiff's Magnesium Oxide was current until May 2017 and that it had not been delivered to
the medical unit at the time of his inquiry but according to the medication record Plaintiff had
received the 30-day supply of that medication. Shaw reminded Plaintiff he should submit a
medication request form to Nurse Ellis at least 10 days before the last dose of medication.
Plaintiff received his Magnesium Oxide pills on January 8, 2017. [Dkt. Nos. 65-4 at ¶ 18; 65-3 at
¶ 9; 8 at 35; 65-1 at 213– 26].

12. On January 15, 2017, Plaintiff executed Grievance No. GCC-17- REG-00033, which
was found to be unfounded, and the Health Service Director upheld that determination on appeal.
[Dkt. No. 8 at 32]. The grievance was determined to be unfounded because it had been resolved
at the informal level prior to the filing of the grievance, and the Health Service Director upheld
that determination on appeal. [Dkt. Nos. 7 at ¶¶ 49-50; 8 at 31, 32].

13. On March 23, 2017,[15] Plaintiff submitted an informal complaint, stamped received on
March 27, 2017, that stated that he had not timely received his 30-day supply of Sotalol and
Magnesium Oxide, and was told by Nurse Ellis that the prescriptions were not available.
Defendant Shaw responded on April 4, 2017 and noted that she had addressed Plaintiff's
concerns with nursing staff in the medical unit and had advised them to request medication from
a local pharmacy if they should continue to have issues receiving medication from the off-site
pharmacy supplier. Shaw also instructed the nurses to dispense Plaintiff's medication upon
delivery to the unit [as opposed to having Plaintiff wait for the designated days—Wednesday,
Saturday, and Sunday—to retrieve KOP medications]. Shaw also noted that Plaintiff should
notify Nurse Ellis when his medication supply was down to between 7 and 10 days. [Dkt. Nos.

---

[15] Plaintiff alleged the date was on or about March 22, 2017 in his verified amended complaint. The exhibits he
submitted indicate the date was March 23, 2017. See Fayetteville Inv'rs v. Commercial Builders, Inc., 936 F.2d
1462, 1465 (4th Cir. 1991) (where complaint's bare allegations conflict with an exhibit, the exhibit controls).

65-4 at ¶ 20; 8 at 40]. Plaintiff then filed Grievance No. GCC-17-REG-00167 stating he had run out of his Sotalol on March 20, 2017. The grievance was "Founded," and the Health Service Director upheld that determination on appeal. Plaintiff had received his Sotalol pills on March 26, 2017. [Id. at ¶¶ 51-52].

14. On March 24, 2017, Plaintiff submitted an Emergency Grievance because he "was feeling lethargic and experiencing dizziness." A non-defendant nurse determined the grievance was not an emergency. [Dkt. No. 8 at 44]. On March 26, 2017, Plaintiff filed an informal complaint that his Sotalol had not been available and that the Emergency Grievance was deemed not to meet the criteria for an emergency even though Plaintiff had stated he was feeling lethargic and experiencing dizziness. The informal complaint was received on March 27, 2017 and responded to by Shaw on April 4, 2017. Shaw noted in her response that Plaintiff's grievance addressed a medication issue, and that Plaintiff did not request to be seen [by a medical provider] at the time. [Dkt. Nos. 65-4 at ¶ 21; 8 at 47].

15. Plaintiff filed two related grievances, Nos. GCC-17-REG-00166 and GCC-17-REG-00167, regarding the Sotalol not being available on March 23, 2017, and each were determined to be "Founded," and stated that the non-defendant nurse should have brought Plaintiff in for an assessment. [Id. at ¶¶ 52-53]. Corrective action was taken, and the non-defendant nurse involved was "re-educated on proper procedure for handling emergency grievances." [Dkt. No. 8 at 42]. Further, the nurses were advised that Plaintiff's Sotalol pills should be available to him at all times. [Id. at 37].

16. On or about April 2, 2017, Plaintiff went to the Pill Call Window to pick up medication, but did not receive his Lisinopril, Simvastatin, Carvedilol, and Aspirin, and he filed Emergency Grievance No. 100379 on April 3, 2017, which was determined not to be an

emergency and he then filed an informal complaint. On April 11, 2017, Defendant Shaw responded to the informal complaint and noted Plaintiff had been provide his medications and reminded him to submit requests for refills to Defendant Ellis when he was "down to a 7-10-day supply." [Dkt. Nos. 8 at 53; 65-4 at ¶ 22; 65-3 at ¶ ; 65-1 at 229 – 31]. Plaintiff received the Lisinopril and Aspirin on April 2, 2017 after filing the Emergency Grievance, and received the Carvedilol and Simvastatin on April 5, 2017. [Dkt. No. 8 at 49]. Subsequent Grievances Nos. GCC-17-REG-00174 and -00188 were each determined to be "Founded," and that determination was upheld on appeal. [Id. at ¶¶ 54-55].

17. On August 29, 2017,[16] Plaintiff submitted an offender request inquiring about the periodic check of his defibrillator because it had been almost a year since it was checked at MCV on October 5, 2016. [Dkt. No. 8 at 67]. Plaintiff was told he would "be contacted" and directed to submit a sick call request. [Id.]. On August 31, 2017, Plaintiff filed an informal complaint stating that he had not been scheduled to have his defibrillator checked in almost a year and that it was recommended to be done every six months. Plaintiff states he received no response and filed Grievance No. GCC-17-REG-00442 on September 25, 2017, which was determined to be unfounded on October 18, 2017 after review of his medical records. The Level I response investigated the complaint and found Plaintiff's medical records established that his defibrillator had been checked on October 5, 2016, and also on April 5, 2017, and was scheduled to be checked on October 4, 2017.[17] [Id. at 62]. Plaintiff filed an appeal on October 21, 2017 admitting

---

[16] Plaintiff's verified amended complaint averred that the offender request was submitted on April 29, 2017, but his exhibit establishes that the offender request was submitted on August 29, 2017. See Fayetteville Inv'rs, 936 F.2d at 1465 (where complaint's bare allegations conflict with an exhibit, the exhibit controls).

[17] Plaintiff's medical records indicate he was in the medical unit on March 17, 2017 inquiring about his defibrillator check and was told he was scheduled for "next month." [Dkt. No. 65-1 at 16]. The medical records also indicate that Plaintiff was seen in the medical unit on "4/5/17" after he returned from the "VCU EP Clinic" [Id. at 17], which appears to be the Electrophysiology Clinic (EP Clinic) referred to in other portions of Plaintiff's medical records. See, e.g. Id. at 84. The medical records indicate that upon his return from the April 2017 check up at the EP Clinic, that there would be a follow up in six months [Id. at 77]; that he was seen in the medical unit at GRCC upon his

his defibrillator was checked on October 5, 2017, but denied that it had been checked on April 5, 2017. The Health Service Director upheld the unfounded determination on appeal. [Dkt. Nos. 7 at ¶ 57; 8 at 61].

18. On October 20, 2017, Plaintiff appeared at the Pill Call Window and informed medical that his prescriptions (Simvastatin, Lisinopril, Aspirin, Carvedilol, Sotalol, and Magnesium Oxide) needed to be refilled. [Dkt. 9-1 at 3]. On October 27, 2017, Plaintiff was informed his Carvedilol prescription was not available. [Dkt. 8-1 at 3]. Plaintiff filed an informal complaint on October 30, 2017 and the response issued that same day indicated the Carvedilol was available for pickup. [Id. at 2]. Plaintiff then filed Grievance No. GCC-18-REG-00557, which was determined to be unfounded and the Health Service Director upheld that determination on appeal. Plaintiff received his Carvedilol on November 2, 2017. [Id. at ¶¶ 58-59].

19. On June 28, 2018, Plaintiff did not receive his Simvastatin and he filed Informal Complaint No. GCC-18-INF-04565. [Id. at 61]. Plaintiff received his medications on July 5, 2017. [Id. at 23-24; Dkt. No. 9-6 at 3].

## Medical Records[18]

20. On January 27, 2016, Plaintiff had a follow-up appointment with cardiologist Dr.

---

return from MCV on October 4, 2017 [Id. at 24]; that he was seen again when he returned from the VCU EP Clinic on both April 4, 2018 and October 3, 2018. [Id. at 29, 36]. The checkups are referred to as "interrogations," and the test results in Plaintiff's medical records indicate that interrogations were conducted on April 5, 2017, October 4, 2017, April 4, 2018, and October 3, 2018. [Id. at 119-136]. The April 5, 2017 test results were compared to a prior test done on October 5, 2016. [Id. at 125, 179]. The records also reflect that Plaintiff was in the GRCC medical unit on April 7, 2016 and "reviewed" the April 5 visit to the EP Clinic with a non-defendant doctor. [Id. at 17]. Plaintiff has not challenged the contents of any of these records in his response.

In addition, Plaintiff objected to a portion of the defendant's undisputed statement of facts because it stated that MCV had arranged for his October, 2016 defibrillator checkup. [Dkt. No. 75 at 3-4]. While medical personnel at GRCC might be "responsible," for arranging such visits, the objection is irrelevant to the fact that he had his checkup in a timely manner.

[18] Defendant Gore reviewed and summarized Plaintiff's relevant medical records. [Dkt. No. 65-1].

Amin. Plaintiff reported minimal chest pain, no shortness of breath, no lower extremity edema, no nausea, no vomiting and good appetite. Plaintiff's vital signs were stable. Plaintiff's heart demonstrated a regular rate and rhythm without murmur, lungs were clear to auscultation, no edema. The cardiologist's impression was ventricular tachycardia[19] on Sotalol, cardiomyopathy and implantable cardioverter defibrillator ("ICD"). The assessment was stable coronary artery disease ("CAD") with a recommended follow-up in 4 months. [Dkt. No. 65-2 at ¶¶ 25, 26; Dkt. No. 65-1 at 91].

21. On May 9, 2016, Plaintiff did not show up for his scheduled chronic care appointment. [Dkt. Nos. 65-2 at ¶ 11; 65-3 at ¶ 12; 65-1 at 7].

22. On May 12, 2016, Plaintiff was seen at GRCC medical for a Chronic Disease Clinic Follow-up and voiced no complaints during the encounter. Plaintiff had no chest pain, no shortness of breath, no palpitations, and no ankle edema. Plaintiff's heart rate was regular without murmurs and the provider submitted a request for cardiac device interrogation at MCV. [Dkt. Nos. 65-2 at ¶ 12; 65-3 at ¶ 13; 65-1 at 8].

23. On May 16, 2016, the medical record reflects a medical provider discontinued Sotalol and started Metoprolol. [Dkt. Nos. 65-2 at ¶ 13; 65-3 at ¶ 14; 65-1 at 9, 201-03]. On June 3, 2016, the medical record reflects Plaintiff did not show up for a cardiac clinic appointment. [Dkt. Nos. 65-2 at ¶ 13; 65-3 at ¶ 14; 65-1 at 9].

24. On June 6, 2016, Plaintiff was evaluated for renewal of Sotalol and a defibrillator check and the Sotalol was ordered. [Dk. No. 65-2 at ¶ 14; 65-3 at ¶ 15; 65-1 at 10, 205].

---

[19] Ventricular tachycardia is an irregular heartbeat where the heart beats faster than normal (usually more than 100 beats per minute) "caused by irregular electrical signals in the lower chambers of the heart (ventricles)" and "episodes may be brief and last only a couple of seconds without causing harm." See Mayo Clinic (https://www.mayoclinic.org/diseases-conditions/ventricular-tachycardia/symptoms-causes/syc-20355138) (last viewed Mar. 3, 2022).

25. On June 17, 2016, Plaintiff saw the cardiologist and reported infrequent chest pain, no shortness of breath, no edema, no nausea, no vomiting and infrequent palpitations. Vital signs were blood pressure 125/70 mmHg, pulse 59 beats per minute. Heart had a regular rate and rhythm without murmurs, lungs were clear to auscultation, there was no edema. The cardiologist's assessment was ventricular tachycardia ("VT") continue with Sotalol, cardiomyopathy ("CMP") with ICD without evidence of heart failure, and arrange for an ICD check at MCV/VCU. The cardiologist assessed Plaintiff as stable CAD without chest pain, and recommended a follow-up in 4 months. There is no documentation of any complaints regarding medication issues, ICD discharges or other symptoms. [Dkt. No. 65-2 at ¶ 26; 65-3 at ¶ 27; 65-1 at 92].

26. On June 23, 2016, a referral request for an appointment at MCV with cardiologist Dr. Amin was completed. [Dkt. No. 65-2 at ¶ 14; 65-3 at ¶ 15; 65-1 at 10]. On September 27, 2016, Plaintiff failed to appear for his scheduled appointment for medication refills and renewals. Id. Plaintiff avers he was never notified of the September 27, 2016 appointment. [Dkt. No. 75 at 2].

27. On September 29, 2016, during his evaluation by a nurse practitioner Plaintiff complained about a delay in receiving Magnesium Oxide and had to wait to have it ordered. Plaintiff's last magnesium level was within normal limits and although irritated, Plaintiff was in no apparent distress and had stable vital signs and a normal examination. The record does not note any complaints by Plaintiff of chest pains, palpitations, shortness of breath or discharge of his implantable defibrillator. Plaintiff was counseled to reduce his dosage of the remaining Magnesium Oxide until his refill was available. Plaintiff stated he understood. The nurse also ordered lab tests so results would be available for his chronic care appointment in

16

November/December. [Dkt. Nos. 65-2 at ¶ 15; 65-3 at ¶ 16; 65-1 at 11-12, 209]. The labs were done on October 12, 2016. [Dkt. No. 65-1 at 13].

28. On October 5, 2016, Plaintiff returned from an outside provider appointment. Although Plaintiff had an elevated blood pressure reading, he did not complain of any distress or express any concern. [Dkt. Nos. 65-2 at ¶ 16; 65-3 at ¶ 17; 65-1 at 13]. Plaintiff had told the outside provider that he had been taken off Sotalol for a period of time and the provider noted that he appeared to have experienced more palpitations during that period of time. Plaintiff's ICD indicated a total of 20 episodes of non-sustained ventricular tachycardia, all brief, and "no therapies were delivered or indicated." [Dkt. No. 65-1 at 179]. The provider concluded that Plaintiff had normal ICD function, and that he should continue with Sotalol unless he was symptomatic for bradycardia with a heart rate of less than 40 beats per minute while awake. [Id.].

29. On October 21, 2016, cardiologist Dr. Amin saw Plaintiff. Plaintiff reported infrequent palpitations, no chest pain, no shortness of breath, no edema, no nausea, no vomiting, and Plaintiff had stable vital signs with blood pressure 133/78 mmHg and pulse 52 beats per minute. Plaintiff had a regular heart rate and rhythm without murmurs, his lungs were clear, and there was no edema. Dr. Amin's assessment was to continue Sotalol, CMP with ICD and recent device check showing normal function without evidence of decompensated heart failure. [Dkt. Nos. 65-2 at ¶ 27; 65-3 at ¶ 28; 65-1 at 93].

30. On December 2, 2016, during an evaluation at the chronic care clinic, Plaintiff voiced no complaints of chest pain, shortness of breath, palpitations, or edema. His heart had a regular sinus rhythm with a pulse of 50 beats per minute. Plaintiff was advised to continue with medication as prescribed and a referral for the EP clinic at MCV was noted. [Dkt. Nos. 65-2 at ¶ 18; 65-3 at ¶ 19; 65-1 at 15].

31. On March 17, 2017, Plaintiff was advised he had a defibrillator check scheduled in April. No complaints from Plaintiff were noted by nursing staff at this encounter. [Dkt. Nos. 65-2 at ¶ 19; 65-3 at ¶ 20; 65-1 at 16].

32. On April 5, 2017, Plaintiff returned from the MCV EP clinic in no apparent distress. [Dkt. Nos. 65-2 at ¶ 20; 65-3 at ¶ 21; 65-1 at 17]. On April 7, 2017, the EP clinic consult and recommendations were noted. Id. No complaints from Plaintiff were documented on either of these dates. Id.

33. On May 12, 2017, nursing staff conducted a self-medication audit and Plaintiff stated he would continue to come to the Pill Call Window for self-medications. The records do not indicate Plaintiff had any concerns about getting his medications. [Dkt. Nos. 65-2 at ¶ 21; 65-3 at ¶ 22; 65-1 at 18, 233-36].

34. On May 15, 2017, Plaintiff was seen for a follow-up from the cardiac catheterization clinic at MCV. Plaintiff was doing well, had no ventricular tachycardia, was found to have a regular sinus rhythm without palpitations and aspirin, Lisinopril, Magnesium Oxide, Simvastatin, and Sotalol were refilled. [Dkt. Nos. 65-2 at ¶ 22; 65-3 at ¶ 23; 65-1 at 21]. On June 5, 2017, Plaintiff's Carvedilol prescription was renewed. Id.

35. On June 8, 2017, during a follow-up at the chronic disease clinic, Plaintiff denied chest pain, shortness of breath, palpitations, or ankle edema. Plaintiff's heart showed a regular sinus rhythm without palpitations, clear chest, and Plaintiff was recommended for a 180-day follow-up. [Dkt. Nos. 65-2 at ¶ 23; 65-3 at ¶ 24; 65-1 at 22].

36. On July 10, 2017, Plaintiff's Carvedilol dosage was adjusted. [Dkt. Nos. 65-2 at ¶ 24; 65-3 at ¶ 25; 65-1 at 23].

37. On September 29, 2017, cardiologist Dr. Amin saw Plaintiff. Dr. Amin noted Plaintiff reported no complaints of chest pain or shortness of breath but did express some coldness in the feet. Plaintiff's vital signs were stable with blood pressure of 106/66 mmHg, pulse 54 beats per minute, heart had regular rate and rhythm without murmurs, lungs were clear to auscultation. Dr. Amin's assessment was to continue Sotalol. Dr. Amin requested an echocardiogram to evaluate Plaintiff's ejection fraction ("EF") for the CMP, and also a lower extremity arterial Doppler study to evaluate circulation in Plaintiff's lower extremities with a request to follow-up after testing was completed. This encounter does not document any complaints by Plaintiff regarding medication issues, ICD discharges or other symptoms alleged in the amended complaint. [Dkt. Nos. 65-2 at ¶ 28; 65-3 at ¶ 29; 65-1 at 94].

38. On October 3, 2017, Gore approved a consult request for Plaintiff to undergo additional diagnostic studies for Plaintiff's heart. [Dkt. Nos. 65-2 at ¶¶ 5, 24; 65-1 at 23, 78].

39. On December 31, 2018, Gore approved a cardiology referral. [Dkt. Nos. 65-2 at ¶ 5; 65-1 at 80].

40. On February 1, 2019, Plaintiff was evaluated by a cardiologist and the cardiologist requested a stress test for further evaluation. [Dkt. Nos. 65-2 at ¶ 5; 65-1 at 99]. The cardiac stress test and follow-up cardiology referrals were made on February 5, 2019 and approved by Gore on February 6, 2019. [Id. at 81-82]. On June 21, 2019, Plaintiff underwent the cardiac stress test. [Id. at 48]. Gore also authorized Plaintiff's cardiac catheterization on September 13, 2019. [Id. at 102, 150-52].

41. On October 4, 2019, at a cardiology follow-up the consulting cardiologist noted that Plaintiff was at low risk for a cardiac event. [Id. at 103].

## II. Standard of Review

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that judgment on the pleadings is appropriate, i.e., that no genuine issues of material fact are present for resolution. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The facts on which a moving party bears the burden of proving are those which are material: materiality is dictated by "the substantive law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

Once a moving party has met its burden of proof, the non-moving party must produce specific facts to generate a disputed issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). A court will view the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. Porter v. U.S. Alumoweld Co., 125 F.3d 243, 245 (4th Cir. 1997). Nevertheless, "[o]nly disputes over facts which might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248.

The non-moving party may not defeat a properly supported summary judgment motion by simply substituting the "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit." Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990). This applies even where the non-moving party is a pro se prisoner. Campbell-El v. Dist. of Columbia, 874 F. Supp. 403, 406-07 (D.C. 1994); see also Local Civil Rule 7(K)(3) (to defeat a dispositive motion, a pro se party "must identify all facts stated by the moving party with which the pro se party disagrees and must set forth the pro se party's version of the facts by offering affidavits ...

or by filing sworn statements....").[20] Unsupported speculation is not enough to withstand a motion for summary judgment. See Ash v. United Parcel Serv., Inc., 800 F.2d 409, 411-12 (4th Cir. 1986). Similarly, "[t]he mere existence of some alleged factual dispute" cannot defeat a motion for summary judgment; the dispute must be both "material" and "genuine," meaning that it "might affect the outcome of the suit under the governing law." Hooven-Lewis v. Caldera, 249 F.3d 259, 265 (4th Cir. 2001) (emphasis omitted).

### III. Analysis

Plaintiff listed ten incidents in his amended complaint, eight of which involved a delay in receiving some of his medications prior to running out between refills; one of which involved a switch in the medication provided, which resulted in a delay in his receiving the prior medication; and the last incident involved an alleged failure to schedule a routine check-up for his defibrillator. The incidents of delay occurred between June 2016 and June 2018. The undisputed facts show that the delays did not result in substantial harm to Plaintiff, and the record establishes the defibrillator check-up actually took place.

To state a claim of deliberate indifference under the Eight Amendment, a plaintiff must allege facts sufficient to show that jail officials were deliberately indifferent to a serious medical need. Estelle, 429 U.S. at 105; Staples v. Va. Dep't of Corr., 904 F. Supp. 487, 492 (E.D. Va. 1995). Thus, plaintiff must allege two distinct elements to state a claim upon which relief can be granted. First, he must allege a sufficiently serious medical need. See, e.g., Cooper v. Dyke, 814 F.2d 941, 945 (4th Cir. 1987) (determining that intense pain from an untreated bullet wound is

---

[20] "Generally, an affidavit filed in opposition to a motion for summary judgment must present evidence in substantially the same form as if the affiant were testifying in court." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 962 (4th Cir. 1996) (citing Fed. R. Civ. P. 56(e)). Affidavits must "be made on personal knowledge, set out facts admissible in evidence, and show that the affiant is competent to testify on the matters stated." Harris v. Mayor & City Council of Baltimore, 429 F. App'x 195, 198 n.5 (4th Cir. 2011). Additionally, "summary judgment affidavits cannot be conclusory ... or based upon hearsay." Evans, 80 F.3d at 962.

sufficiently serious); Loe v. Armistead, 582 F.2d 1291, 1296 (4th Cir. 1978) (concluding that the "excruciating pain" of an untreated broken arm is sufficiently serious). A serious medical need is one that poses a substantial risk of serious injury to an inmate's health and safety. Young v. City of Mt. Ranier, 238 F.3d 567, 576 (4th Cir. 2001).

Second, Plaintiff must allege deliberate indifference to that serious medical need. Under this second prong, an assertion of mere negligence or even malpractice is not sufficient to state an Eighth Amendment violation; instead, plaintiff must allege deliberate indifference "by either actual intent or reckless disregard." Estelle, 429 U.S. at 106; Daniels v. Williams, 474 U.S. 327, 328 (1986); Miltier v. Beorn, 896 F.2d 848, 851 (4th Cir. 1990). A prisoner's disagreement with medical personnel over the course of his treatment does not suffice. Wright v. Collins, 766 F.2d 841, 849 (4th Cir. 1985); Russell v. Sheffer, 528 F.2d 318, 319 (4th Cir. 1975) (per curiam); Harris v. Murray, 761 F. Supp. 409, 414 (E.D. Va. 1990). The treatment an inmate receives from a health care provider constitutes deliberate indifference only where it is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness." Miltier, 896 F.2d at 851. A defendant must act with either actual intent or reckless disregard, meaning that a defendant disregarded "a substantial risk of danger that is either known to the defendant or which would be apparent to a reasonable person in the defendant's position." Id. at 851-52.

In addition, to state a cause of action under § 1983, a plaintiff must allege facts indicating that he was deprived of rights guaranteed by the Constitution or laws of the United States and that the alleged deprivation resulted from conduct committed by a person acting under color of state law. See West v. Atkins, 487 U.S. 42, 48 (1988); Barren v. Harrington, 152 F.3d 1193, 1194-95 (9th Cir. 1998) ("A plaintiff must allege facts, not simply conclusions, that show that an

individual was personally involved in the deprivation of his civil rights."); see also Johnson v. Duffy, 588 F.2d 740, 743-44 (9th Cir. 1978) (discussing "requisite causal connection" in § 1983 cases between named defendant and claimed injury).

"Just as the relevant 'medical need' can only be identified in relation to the specific factual context of each case, the severity of the alleged denial of medical care should be analyzed with regard to all relevant facts and circumstances," Smith v. Carpenter, 316 F.3d 178, 187 (2d Cir. 2003). Delay is a consideration and "the objective seriousness of the deprivation should be measured 'by reference to the *effect* of delay in treatment.'" Crowley v. Hedgepeth, 109 F.3d 500, 502 (8th Cir. 1997) (quoting Hill v. DeKalb Reg'l Youth Detention Ctr., 40 F.3d 1176, 1188 (11th Cir. 1994), overruled in part on other grounds, Hope v. Pelzer, 536 U.S. 730, 739 n.9 (2002)).

> When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in "objective terms, sufficiently serious," to support an Eighth Amendment claim.

Smith v. Carpenter, 316 F.3d 178, 185 (2d Cir. 2003).

The Fourth Circuit has recently commented on delay in the in the context of the provision of medical services to inmates and observed that "[n]ot all medical delays" constitute deliberate indifference and "[i]t would be wrong to turn the everyday inconveniences and frictions associated with seeking medical care into constitutional violations whenever they occur within the prison walls." Moskos v. Hardee, 24 F.4d 289, __, 2022 U.S. App. LEXIS 1711, *17 (4th Cir. 2022). "A commonplace medical delay such as that experienced in everyday life will only rarely suffice to constitute an Eighth Amendment violation, absent the unusual circumstances where the delay itself places the prisoner at '*substantial risk of serious harm*,' such as where the

prisoner's condition deteriorates markedly or the ailment is of an urgent nature." Id. (emphasis added). Moskos held that "circumstances … involving a short delay …, without any aggravating factors such as a serious medical reaction, courts have consistently found that the objective prong is not satisfied." Id. at 18 (citations omitted).

Lastly, while delay of, or interference with, medical treatment can amount to deliberate indifference, see Formica v. Aylor, 739 F. App'x 745, 755 (4th Cir. 2018); Jett v. Penner, 439 F.3d 1091, 1096 (9th Cir. 2006), there is no Eighth Amendment violation

> unless "the delay results in some substantial harm to the patient," such as a *"marked"* exacerbation of the prisoner's medical condition or "frequent complaints of severe pain." See Webb v. Hamidullah, 281 F. App'x 159, 166-67 (4th Cir. 2008) (emphasis added); see also Sharpe v. S.C. Dep't of Corr., 621 F. App'x 732, 734 (4th Cir. 2015) ("A delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain." (internal quotation marks omitted)).

Formica, 739 F. App'x at 755. Substantial harm may also be "a life-long handicap or permanent loss.'" Coppage v. Mann, 906 F. Supp. 1025, 1037 (E.D. Va. 1995) (quoting Monmouth Co. Corr. Inst. Inmate v. Lanzaro, 834 F.2d 326, 347 (3d Cir. 1987)). "[T]he length of delay that is tolerable depends on the seriousness of the condition and *the ease of providing treatment*." Id. at 758 (quoting McGowan v. Hulick, 612 F.3d 636, 640 (7th Cir. 2010)) (emphasis added).[21]

*A. Delays in Prescription Refills*

Plaintiff alleges his prescriptions were not refilled in a timely manner on nine occasion over a twenty-four-month period, June 2016 through June 2018. See, supra at 3-4. However, missing a single dose, or several doses, of a needed medication, without more, is insufficient to

---

[21] An inmate who complains that a delay in medical treatment is a constitutional violation "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed." Hill, 40 F.3d at 1188. Further, the "[t]olerable length of delay in providing medical attention depends on the nature of the medical need and the reason for delay." Id. (quoting Harris v. Coweta County, 21 F.3d 388, 393-94 (11th Cir. 1994)).

establish an Eighth Amendment violation. See Burton v. Downey, 805 F.3d 776, 785 (7th Cir. 2015) ("a two-day delay is not enough, standing alone, to show a culpable mental state. The delay may or may not have been negligent, but it did not constitute deliberate indifference for purposes of the Due Process Clause of the Fourteenth Amendment."); Frost v. Agnos, 152 F.3d 1124, 1130 (9th Cir. 1998) (alleged delays in administering pain medication, without more, do not constitute deliberate indifference); VanCourt v. Lehman, 137 F. App'x 948, 950 (9th Cir. 2005) (one day delay in receiving pain medication for head injuries and a broken nose suffered in an attack did not demonstrate deliberate indifference to a serious medical need); King v. Kilgore, No. 96-40126, 1996 U.S. App. LEXIS 43242, *1 (5th Cir. Sept. 9, 1996) (affirming district court's dismissal of prisoner's deliberate indifference claim where prisoner failed to establish substantial harm from delay in treatment that allegedly prolonged his asthma attack, causing "him pain, suffering, and discomfort").[22]

Plaintiff alleges that the missed dosages from June 2016 through April 2017 caused him to suffer "irregular heart fluctuations, pacemaker corrections, dizziness, headaches, anxiety, temporary losses of balance, and dangerously high blood pressures without his medications." [Dkt. No. 7 at 34-35]. Plaintiff's medical records establish his blood pressure readings were not

---

[22] See Smith v. Carpenter, 316 F.3d 178, 188-89 (2d Cir. 2003) (affirming denial of motion for new trial for Eighth Amendment violation where plaintiff "presented no evidence that the two alleged episodes of missed medication resulted in permanent or on-going harm to his health"); Ferguson v. Cai, No. 11cv6181, 2012 U.S. Dist. LEXIS 97049, at *13-14 (S.D.N.Y. Jul 12, 2012) (missing single dose of insulin that caused temporary blindness, pain, and leg swelling not actionable); Bumpus v. Canfield, 495 F. Supp. 2d 316, 322 (W.D.N.Y. 2007) (dismissing claim of deliberate indifference based on "a delay of several days in dispensing plaintiff's hypertension medication" absent evidence that "the delay gave rise to a significant risk of serious harm"); Jackson v. Fauver, 334 F. Supp. 2d 697, 718 (D.N.J. 2004) (holding that a six week delay in receiving HIV/AIDS medication did not state a claim for cruel and unusual punishment where the plaintiff did not establish any harm caused by the delay); Evans v. Bonner, 196 F. Supp. 2d 252, 256 (E.D.N.Y. 2002) (granting summary judgment for defendant on claim that medication was not timely distributed even where plaintiff alleged that he had suffered "aches, pains and joint problems" due to withdrawal because "the alleged injury to the plaintiff resulting from not getting his medicine on time does not rise to a sufficiently serious level."); see also Nolley v. County of Erie, 776 F. Supp. 715, 740 (W.D.N.Y. 1991) (the occasional failure of the correctional facility to provide an inmate with her AZT medication did not violate the Eighth Amendment as the failure was due to a negligent medication delivery system, and not to a deliberate indifference on the part of medical personnel).

dangerously high; he regularly saw his cardiologists; his pacemaker was checked at regular

intervals; and on October 4, 2019, his cardiologist determined he was at a low risk for a cardiac

event. [Dkt. No. 65-1 at 103]. There is no evidence to support a claim of substantial harm and the

unrefuted evidence of the defendants establishes that any delays in medication did not result in

the requisite substantial harm necessary to state a claim of deliberate indifference. See Easter v.

Powell, 467 F.3d 459, 464 (5th Cir. 2006) (holding that a delay in medical care must cause

"substantial harm" to be a constitutional violation). A district court in Texas addressed a similar

claim and found no Eight Amendment violation

> A delay which does not aggravate or exacerbate the medical condition does not
> constitute a constitutional violation. Martin v. Gentile, 849 F.2d 863, 871 (4th Cir.
> 1988). A delay in medical care to a prisoner can constitute an Eighth Amendment
> violation only if there has been deliberate indifference, which results in
> substantial harm. Mendoza v. Lynaugh, 989 F.2d 191, 195 (5th Cir. 1993). The
> fact that plaintiff suffered headaches and dizziness while waiting for an
> opportunity to see a physician does not constitute substantial harm.

McQueen v. Revell, No. 2:01cv88, 2001 U.S. Dist. LEXIS 17155, *11-12 (N. D. Tex. Oct. 22,

2001); see, e.g., McKenzie v. Magee, No. 94-3260-RDR, 1997 U.S. Dist. LEXIS 13536, *7-8,

1997 WL 542938 (D. Kan. Aug. 4, 1997) (dismissing claim of deliberate indifference because

there was "no evidence plaintiff's condition required immediate attention" and "no evidence

[plaintiff] suffered substantial harm from the alleged delay").

Here, defendants Gore and Shaw were not responsible for or involved in ordering

prescriptions from outside pharmacies. [Dkt. Nos. 65-2 at ⁋ 8; 65-4 at ⁋ 6]. In addition, the

records establish that defendant Gore approved the off-site medical appointments for Plaintiff,

and that defendant Shaw investigated Plaintiff's complaints and grievances regarding untimely

refills, made sure he received his medications, see, supra at 7-11, and took corrective action by

instructing nurses involved in the dispensing of medications to use local pharmacies if necessary

to ensure Plaintiff received his medications and to allow Plaintiff to receive his refills when they

came in rather than on the three designated Pill Call days. [Dkt. Nos. 65-4 at ¶ 20; 8 at 40]. No reasonable jury could find that either defendant was deliberately indifferent to Plaintiff's need to have his prescriptions refilled.

While defendant Ellis was more directly involved in the ordering and dispensing of prescriptions to inmates, the evidence establishes that Ellis took corrective action whenever the off-site pharmacy had not provided Plaintiff's refills in a timely manner. In addition, as noted, the delay in receiving refills did not result in substantial harm.

While the Court can understand Plaintiff's frustration over the several delays in obtaining his refills, the delay was not deliberate. Such delays are an inconvenience and commonplace outside of prisons as well. Each time Plaintiff was unable to refill his prescriptions, the medical personnel acted as quickly as possible to ensure that the prescriptions were obtained and delivered to Plaintiff. The several delays were each short in duration and, absent substantial harm, do not rise to the level of a constitutional violation. To be sure, Plaintiff's cardiologists found he was at low risk for a cardiac event when he was seen on October 4, 2019, several months after the last alleged issue with medication renewals alleged in the amended complaint. [Id. at 103].[23]

*B. Defibrillator Check-up*

On August 31, 2017, Plaintiff alleges that he complained he had not been scheduled for his defibrillator checkup review at MCV. [Dkt. No. 7 at 23]. The uncontested medical records indicate that the checkups occurred on a six-month interval and that Plaintiff had defibrillator checkups on October 5, 2016, April 5, 2017, October 4, 2017, April 4, 2018, and October 3,

---

[23] Plaintiff has also stated that he had submitted the self-med request forms ten days prior to when he was due to run out and "for the last year all of [his] medications have been timely available for pickup." [Dkt. No. 76 at 2].

2018. See, supra at note 17. It is plain from the records that Plaintiff's defibrillator is regularly checked, and it was checked during the time frame encompassed by the amended complaint. In addition, as Plaintiff's cardiologist determined he was at a low risk for a cardiac event on October 4, 2019 [Dkt. No. 65-1 at 103], he also failed to show that he has suffered any substantial harm.

### IV. Conclusion

For the reasons outlined above, defendants' motion for summary judgement [Dkt. No. 64] will be granted through an Order that will issue alongside this Memorandum Opinion.

Entered this ___4/th___ day of ___March___ 2022.

Alexandria, Virginia

/s/

T. S. Ellis, III
United States District Judge